Filed 4/7/23  P. v. Spivey CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDDIE CHARLES SPIVEY,<br><br>    Defendant and Appellant. | C091512<br><br>(Super. Ct. Nos. STK-CR-FE-1990-0005342, SC045763) |

A jury found defendant Eddie Charles Spivey guilty of second degree murder and assault with a firearm and found true a personal firearm use enhancement attached to each offense.  (*People v. Spivey* (Sept. 30, 1992, C009499) [nonpub. opn.].)  In 2019, defendant petitioned under Penal Code[1] section 1172.6[2] for resentencing and the trial

---

[1]     Further undesignated section references are to the Penal Code.

[2]     Effective June 30, 2022, the Legislature renumbered former section 1170.95 as section 1172.6.  (Stats. 2022, ch. 58, § 10.)  There were no substantive changes to the

court issued an order to show cause. Following an evidentiary hearing, the trial court denied defendant's petition finding beyond a reasonable doubt that defendant was an accomplice to implied malice murder.

Defendant appeals arguing aiding and abetting an implied malice murder is no longer a viable theory of murder following Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, §§ 1-3) and that, in any event, the jury's verdicts precluded the trial court from finding he acted with implied malice. In the alternative, defendant contends insufficient evidence supports the trial court's finding that he acted with implied malice. Further, defendant argues the trial court committed several evidentiary errors or impermissibly applied the evidence presented. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND[3]

Because there is no material dispute pertaining to the facts of defendant's offenses, we summarize the facts as we did on direct review of the judgment and supplement the factual background with evidence from the record established at the evidentiary hearing as necessary for discussion of the issues raised by defendant in this appeal.

---

statute. Although defendant filed his petition under former section 1170.95, we cite the current section 1172.6 throughout the remainder of this opinion.

[3]    Defendant notes the reporter's transcript from his original trial that was admitted into evidence at his evidentiary hearing was incomplete. His appellate counsel, however, located a complete reporter's transcript and augmented the appellate record so that the complete reporter's transcript could be considered. On appeal, defendant relies on portions of the complete reporter's transcript that do not appear to be included in the reporter's transcript admitted at the evidentiary hearing. We do not include facts in our factual recitation not admitted into evidence at the evidentiary hearing because our review of the trial court's ruling is limited by the evidence it had before it and not by evidence produced later. (*People v. Panah* (2005) 35 Cal.4th 395, 434, fn. 10; *People v. Welch* (1999) 20 Cal.4th 701, 739.)

2

I

*Evidence Admitted At Defendant's Jury Trial*

The shootings occurred in the early morning hours of September 16, 1989. "The murder victim was 16-year-old Marcus . . . . His twin brother, Marquis, was the assault victim." (*People v. Spivey*, *supra*, C009499.) A Stockton police officer responding to a dispatch call went to a home where he spoke with a young male claiming to be 22 years old and named Charles. "[The young male] had been shot in the upper leg. He said he had been walking back from the store and did not know the identity of his assailant. 'Charles' would not provide any other information. This person was then taken by paramedics to the county hospital. Returning to his patrol car in order to drive over to the hospital, [the officer] heard someone yell that a person had been shot outside. Heading over to the location indicated, the officer saw another young male lying prone on the sidewalk. When rolled over on his back, the victim bore a marked resemblance to 'Charles.' An autopsy showed the homicide victim, Marcus . . . , died of shock and hemorrhage from two bullet wounds to the chest; there was also a wound to the left shoulder. The wounds were not consistent with shotgun injuries.

"At the hospital, 'Charles' continued to stonewall. Upon hearing Marcus . . . was dead, 'Charles' admitted to being Marquis . . . , the deceased's twin brother. He explained at trial he had not wanted to reveal his real identity because he had an outstanding juvenile warrant, so he used his older brother's name.

"As Marquis eventually made clear at trial, he was standing outdoors in front of a relative's house . . . a little after midnight on the night in question when he saw his brother almost [get] hit by a car . . . . Marcus and the female driver of the car exchanged angry words. Marcus was standing right by the driver's window, but at no point did Marquis see his brother strike her.

"A short time later, a large adult male and his female companion accosted Marquis. Marcus had left the area. Marquis did not recognize the woman at first, but he

3

was able to figure out that she had been the driver. He did not know she was the defendant's sister . . . . He was also unfamiliar with the man, though later learned his name was Greg Mitchell. Mr. Mitchell accused Marquis of striking [defendant's sister]. Ultimately, [defendant's sister] told her companion that Marquis was not the object of their search and the couple left.

"At least in the version he gave at trial, Marquis then went off in search of Marcus, finding him at a nearby hangout lying in the bed of a pickup truck . . . . Marquis told Marcus what had happened; Marcus denied hitting the woman. . . . Although Marquis wanted to get away from Mr. Mitchell, Marcus wanted to return; Marquis went along out of brotherly concern. [A friend] dropped off the brothers at their relative's house. Marquis went inside to talk with the relatives. When he came back out, he found Marcus had wandered off.

"Marquis went down to the corner to see if he could find his brother. Walking back, he was confronted by Mr. Mitchell, the defendant (whom Marquis knew), and . . . Romano S[.] Mr. Mitchell was holding a handgun; the others were holding shotguns. Mr. Mitchell put the gun to Marquis's head and told him to lie down. He then started asking Marquis where Marcus had gone. When Marquis pled ignorance, Mr. Mitchell fired the gun into the ground. As Marquis recollected at trial, the gunshot was followed by a blast from one of the shotguns, hitting the ground near his upper chest; he was then shot in the leg by Mr. Mitchell. All the while, Mr. Mitchell kept asking for the location of Marcus and threatening to kill Marquis. Neither the defendant nor [Romano] asked any questions. Finally, 'someone'[4] said Marcus was over on an adjoining street. The three assailants left him, and Marquis made it back into his relatives' house, who called

---

**4** "According to the defendant, the 'someone' was Marquis."

911 for him.  A few minutes later, he heard more gunshots.  The police arrived about 10 minutes later.

"Backtracking to pick up events recounted by the defendant[5] and his cronies,[6] the defendant was drinking at the home of a friend . . . .  Present were [Romano] and [Randy], among others.  At some point, the defendant fell asleep in one of the bedrooms with a friend.  Just after midnight, [defendant's sister] came to the door.  (It is unclear from the record where this fits chronologically in relation to the original incident, her confrontation of Marquis with Mr. Mitchell, and the assault on Marquis.)  She told [Romano] (who is a cousin [to her and defendant]) that she had been slapped by one of the twins.  She also told him that her boyfriend, Mr. Mitchell, had already gone to look for the twin.  [Romano] went into the bedroom to awaken the defendant and tell him what had happened.  They went outside, where [defendant's sister] repeated to her brother that she had been slapped.  Both [Romano] and the defendant denied that [defendant's sister] acted as an agent provocateur with respect to any retaliation they should take.  They decided on their own to 'just go and see what happened.'  'You know, why he slapped her.'  The two cousins denied any preexisting animosity between themselves and the

---

**5**     "The defendant was interviewed on September 17[, 1989,] after being identified by Marquis.  He initially denied any knowledge, then after his alibi collapsed[,] he admitted being at the scene, then after being told he was not being truthful[,] he provided a fuller recount but denied being armed, then he told the officer 'I'm going to tell you the truth,' at which point he admitted having a rifle, then he started over again.  The next day he told the officer he had been armed with a shotgun, not a rifle, and had fired it only once, up into a tree.  His trial testimony . . . also differs in significant respect from these various statements."

**6**     "[Romano] provided no fewer than four different versions of that night's events before his final statement was transcribed on September 19[, 1989].  He, too, departed from these at trial.  Randy . . . , whom we shall meet momentarily, had three interviews with the police and also disavowed the truth of portions of the extrajudicial statements at trial."

twins, and denied having any intent to shoot or to kill, or even discussing such action; the defendant testified he just wanted to talk with them -- they were too young to bother fighting with them.

"As they were standing outside, [defendant's sister] departed and [Randy] returned from a beer run and an unsuccessful attempt to get a key to his mother's house. He dropped off his passengers and agreed to take the defendant and [Romano] over to where the . . . confrontation [between Marcus and defendant's sister] had taken place, which happened to be right by his mother's home. On the way, they stopped at the defendant's mother's home, where the defendant retrieved two shotguns from a shed out back. . . . [T]he three claimed they did not speak to each other during the entire ride regarding their objective, even after the defendant had obtained the shotguns. The defendant said they needed guns for protection, because Marcus was known to carry a gun (although the defendant admitted that when he had seen Marcus earlier in the evening Marcus had not had a gun with him).

"[Randy] parked by his mother's house. As he headed to her front door, he saw the defendant and [Romano] pass [defendant's sister's] parked car, in which she was sitting, and head after Mr. Mitchell (who was standing on the corner). At trial, all three denied there was any plan for meeting up together later on.

"While [Randy] was waiting for someone to come to his mother's door, he heard shots. Turning, he saw Marquis limping toward a house. Someone at last opened the door, and [Randy] went in. While inside, he heard additional shots. He then departed the house . . . . As he walked toward his car, he could see the body of Marcus. According to an inconsistent pretrial statement, as he drove off he saw the defendant and [Romano] leap over a fence, shotguns in hand, and get into his car, saying 'let's go.' " (*People v. Spivey*, *supra*, C009499.)

"Switching to the perspective of the defendant and [Romano] . . . [who] approached Mr. Mitchell[ while] carrying the shotguns. They denied that [Mr. Mitchell]

6

had beckoned to them in any way or directed them to do anything; they were simply following after him. They did not say anything to each other. As they approached, Mr. Mitchell said 'here comes my brother-in-law' (presumably indicating the defendant), pulled out a handgun, and pushed Marquis to the ground.

"Their detailing of the several shots fired at Marquis differed. [Romano] said Mr. Mitchell fired into the ground, prompting Marquis to say he was not the one Mr. Mitchell wanted. Mr. Mitchell fired a total of three times, the second one into the victim's leg. [Romano] said he and the defendant each fired their shotguns into the ground away from Marquis. He wanted to scare Marquis, but [Romano] claimed this was not toward any particular end. He then followed the defendant toward the corner. In the defendant's version, he thought he might have been the first to shoot, aiming at the ground away from Marquis. He admitted he did this to obtain information, although he himself was not doing any questioning. He and [Romano] each shot once. Mr. Mitchell then fired into the ground, at which point Marquis said his brother was over on the adjoining street. The defendant turned and walked away. He heard one more shot from Mr. Mitchell's gun, but he did not look back, so he did not see Mr. Mitchell actually shoot Marquis. . . . Mr. Mitchell said nothing to either the defendant or [Romano], nor did the cousins speak between themselves even as they walked toward the corner away from Marquis. They asserted they had no idea what Mr. Mitchell was intending to do when they walked away from him.

"Both the defendant and [Romano] had said (at some point) that they were walking around the corner to find Marcus, the defendant claiming he simply wanted to bring Marcus back to speak with his sister but would not have forced Marcus to do so. [Romano] said they did not see anyone when they walked around the corner; the defendant (in an earlier statement) said he saw Marcus, who ran off through a back yard. The defendant (again in the earlier statement) said he then headed back to his original

7

location to cut off Marcus, hearing gunshots as he did so. [Romano] concurred that they heard shots and then retraced their steps.

"The defendant consistently denied seeing Mr. Mitchell actually shoot Marcus as they came around the corner. In his earlier statement, [Romano] said he saw Mr. Mitchell shoot Marcus, then jump in his car and leave. He also said the defendant had fired his shotgun in the direction of Marcus after Marcus had hit the ground.

"On the ultimate issue, [Romano] denied ever wanting to assist with any shooting or killing, even though he had pled guilty to voluntary manslaughter in exchange for his testimony. The defendant said he assumed Mr. Mitchell was there for the same reason he was, i.e., because [defendant's sister] got slapped, but he did not know Mr. Mitchell's intentions and if he had, he never would have gone over there because he did not want to assist any shooting or killing. He did not go around the corner in search of Marcus to help Mr. Mitchell kill him." (*People v. Spivey*, *supra*, C009499.)

Based on the above evidence, a jury found defendant guilty of second degree murder and assault with a firearm, and found true that he had personally used a firearm during the commission of those offenses. (*People v. Spivey*, *supra*, C009499.)

II

*Evidence Admitted At Defendant's Evidentiary Hearing*

In 2019, defendant filed a petition for resentencing. After issuing an order to show cause, the trial court held an evidentiary hearing. The prosecution introduced into evidence a portion of the reporter's transcript from defendant's trial, transcripts from two of defendant's parole suitability hearings, and all the exhibits attached to the prosecution's informal response to defendant's petition, which included our appellate opinions in defendant's and Mitchell's direct appeals of their respective judgments, selected jury instructions given at defendant's trial, the Ninth Circuit Court of Appeal decision rejecting all of defendant's claims in a habeas corpus proceeding, and a

8

transcript of Mitchell's parole suitability hearing. Defendant objected to the admission of transcripts from the parole suitability hearings.

At the evidentiary hearing, Mitchell testified on behalf of the prosecution. He said he was the person who shot Marcus. The prosecution confronted Mitchell about an affidavit he wrote for defendant in 2014, which defendant attached to his petition in this matter. Mitchell explained that he prepared the affidavit because he "felt [defendant] was innocent [of] the crime." Mitchell explained he had "suggested [defendant] to come [help him]. [Defendant] was a young man. He was [a] young and still impressionable young man. The events that took place unfolded without him knowing about it, because it happened so fast. But I feel that him getting sentenced to a life sentence was unfair to him, because the only thing he [did] was sho[o]t a shotgun in the air. [¶] And by me being the perpetrator and using a gun and shooting an individual and killing him, and by me understanding the severity of what was happening to [defendant], I felt it was important that I explained to the court that I was the shooter, and that [defendant] had c[o]me when I asked him to come. He had no idea what was getting ready to unfold, unravel. And by me being older than him, he was only coming to support me because somebody assaulted his sister." At the time of the murder, Mitchell was 33 years old, and defendant was 23 years old.

Mitchell testified that, the night of the murder, defendant's sister, who he had been dating, told him that someone had slapped her. When Mitchell confronted Marquis about the slap, Marquis acted as if he had a gun. Other people were around and started laughing at Mitchell because he was not armed and, as a drug dealer, was expected to be. In other words, Mitchell had been "caught slipping" due to his lack of gun possession. Mitchell became enraged because of the laughter and told defendant's sister to retrieve his .357 handgun. Mitchell also believed Marcus and Marquis to be gang members and wanted to confront them with a gun out of safety concerns about slapping defendant's sister. Mitchell also told defendant's sister to get defendant because he "needed to make

9

sure [he] had backup." The trial court overruled defendant's hearsay objection to this testimony but found that Mitchell did not make a statement about needing backup and that no statement was communicated to defendant.

Defendant's sister returned to Mitchell with his .357 handgun, and five to 10 minutes later, defendant arrived with his shotgun. The two found Marquis and Mitchell shot him in the leg. Defendant shot his shotgun into a tree.

Mitchell further clarified the events between shooting Marquis and killing Marcus. He testified that he and defendant's sister were in defendant's sister's car. Mitchell gave defendant's sister his gun because he did not want it with him when he got into his own car. After leaving defendant's sister's car and getting into his own car, Marcus ran down the street and jumped into Mitchell's car. Marcus told Mitchell that somebody had just shot his brother and he needed a ride. Mitchell jumped out of the car and asked defendant's sister whether Marcus was the person who had slapped her. Defendant's sister "had her finger on the outside of the cylinder [of the gun] holding it towards [Marcus] and [Mitchell] snatched it out of her hand and fired. [Marcus] fell back into the car. [Mitchell] went to the other side . . . and shot [Marcus] again. Marcus ran down the street and . . . died." Mitchell never communicated to defendant that he intended to kill Marcus.

III

*The Trial Court's Ruling*

The trial court issued an oral ruling after reviewing the petition and related briefing, the original court file, the jury instructions provided to the jury, the questions submitted to the court by the jury, the reporter's transcripts provided by the parties, and the appellate court opinion. The trial court overruled defendant's objection to statements he and Mitchell made during their parole suitability hearings but said the evidence had, in substance, been admitted at defendant's original trial and it would have come to the same conclusion had it excluded the statements.

10

The trial court began with a discussion of the jury instructions and case law describing implied malice murder. The trial court then went through the facts of defendant's offenses, starting with statements from his parole hearing, in which defendant admitted to shooting at Marquis and jogging to the scene of Marcus's murder. Defendant admitted at his parole hearing the altercation began because the twins had disrespected his sister.

The trial court then summarized a ruling made on defendant's motion for a new trial. There, the trial court spoke to the sufficiency of the evidence supporting the jury's murder verdict. Finding sufficient evidence, the trial court noted that the evidence could easily establish that defendant acted as a coconspirator or an aider and abettor in causing great bodily injury or death to Marcus. It found " 'that [defendant's] further pursuit of Marcus . . . after the completion of the [assault with a firearm] as to Marquis . . . is the act that held [defendant] into the murder charge. And that his acts were not complete and he was . . . not found guilty of the murder based on the assault with a firearm on Marquis and the transaction that happened prior.' "

The trial court disagreed with defendant that "the natural and probable consequences doctrine was the prosecutor's only theory of liability for which [defendant] could have been convicted of murder" and, instead believed the prosecution had a strong case for implied malice murder based on an aiding and abetting theory. It pointed to defendant arming himself, watching Mitchell threaten to kill Marquis, and participating in the shooting of Marquis. The trial court noted that, after this conduct, defendant and Mitchell worked together in their pursuit of Marcus, such that defendant "either specifically intended to aid Mitchell in killing Marcus or knew Mitchell intended to shoot Marcus, an act inherently dangerous to human life where murder is a reasonabl[y] foreseeable consequence. And the act was a conscious disregard for life by [defendant] continuing to aid Mr. Mitchell by locating Marcus."

11

Accordingly, the trial court ruled the evidence "establish[es] beyond a reasonable doubt that [defendant] was convicted of second degree murder based on a valid theory. Specifically that he aided and abetted implied malice murder." Thus, the trial court denied defendant's petition for resentencing.

Defendant appeals.

## DISCUSSION

## I

*Aiding And Abetting Implied Malice Murder Is A Viable Theory Of Murder*

Defendant contends that, after the amendments to sections 188 and 189 made by Senate Bill No. 1437 (2017-2018 Reg. Sess.), aiding and abetting implied malice murder is not a valid theory of murder liability because the theory "contravenes the requirement that direct aiders and abettors harbor a specific intent to commit the charged crime." (Boldface omitted.) We disagree.

Defendant acknowledges that this court in *People v. Powell* (2021) 63 Cal.App.5th 689, held that an implied malice aider and abettor must know that the perpetrator intended to commit the life-endangering act; intend "to aid the perpetrator in the commission of the act"; know "the act is dangerous to life"; and act "in conscious disregard for human life." (*Id.* at p. 713, italics omitted.) In *Powell*, we cited *People v. Gentile* (2020) 10 Cal.5th 830, 850 (*Gentile*), where our Supreme Court noted that Senate Bill No. 1437 (2017-2018 Reg. Sess.) eliminated the natural and probable consequences doctrine but not second degree murder liability for an aider and abettor who " 'knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' " (*Powell*, at p. 713.) Defendant asserts that *Powell* was wrongly decided and is inconsistent with *Gentile* (despite the former expressly relying on the latter), which defendant argues summarized *direct* liability for implied malice murder not aider and abettor liability. Not so.

12

"Murder, whether in the first or second degree, requires malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 844.) "Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2)). When a person directly perpetrates a killing, it is the perpetrator who must possess . . . malice. [Citations.] Similarly, when a person directly aids and abets a murder, the aider and abettor must possess malice aforethought." (*Gentile*, at p. 844.)

In *Gentile*, our Supreme Court explained that a direct aiding and abetting theory of murder "requires that 'the aider and abettor . . . know and share the murderous intent of the actual perpetrator.' [Citation.] For implied malice, the intent requirement is satisfied by proof that the actual perpetrator ' "knows that his conduct endangers the life of another and . . . acts with conscious disregard for life." ' [Citation.] Therefore, notwithstanding Senate Bill [No.] 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, *supra*, 10 Cal.5th at p. 850.)

As we have explained, "In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life[-]endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." (*People v. Powell*, *supra*,

13

63 Cal.App.5th at p. 713, italics & fns. omitted; accord, *People v. Vargas* (2022) 84 Cal.App.5th 943, 954.)

Defendant argues that, in eliminating the natural and probable consequences doctrine, Senate Bill No. 1437 (2017-2018 Reg. Sess.) eliminated aider and abettor liability for unintended murders and made the crime of aiding and abetting murder structurally identical to crimes like attempted murder and conspiracy to commit murder, which both require express malice. We rejected this argument in *Glukhoy* and upheld *Powell*. (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 590-591, review granted July 27, 2022, S274792 (*Glukhoy*).)

In *Glukhoy*, we said, "[F]or second degree murder based on implied malice, there is no imputation of malice because, as we have explained, the direct aider and abettor must have the same mental state as the actual perpetrator of the charged crime: the direct aider and abettor must act with knowledge that the act is dangerous to human life and with conscious disregard for human life. Given the mens rea requirements for aiding and abetting implied malice, not only is malice not 'imputed' on this direct aiding and abetting theory, but liability is not grounded 'solely' upon participation in the crime within the meaning of section 188, subdivision (a)(3) as amended in Senate Bill [No.] 1437. Liability for murder is grounded upon the requirement that the aider and abettor personally harbor malice." (*Glukhoy*, *supra*, 77 Cal.App.5th at pp. 590-591, rev. granted, italics omitted.)

We further held that "nothing in Senate Bill [No.] 775 [(2021-2022 Reg. Sess.) (Stats. 2021, ch. 551)] or its legislative history indicates a rejection of our high court's observation concerning the availability of direct aiding and abetting implied malice murder as a theory of accomplice liability, nor is there any legislative history indicating disagreement with our holding in *Powell*. If the Legislature intended to abrogate aiding and abetting implied malice murder, we think it would have expressly done so in Senate

14

Bill [No.] 775." (*Glukhoy*, *supra*, 77 Cal.App.5th at p. 591, rev. granted.) Accordingly, aiding and abetting implied malice murder is a valid theory of murder.

## II

### *The Trial Court's Findings Did Not Conflict With The Jury's Verdict*

Defendant spends much time attempting to convince us to refine the objective element of the implied malice murder standard for aiders and abettors, i.e., that an aider and abettor aid the perpetrator's life-endangering act, to more narrowly define the conduct that must be aided. Defendant does not argue how the refinement of the objective element would change the outcome of his case, and instead focuses his analysis on the jury verdicts' effect on the trial court's finding regarding the subjective element of implied malice murder. Because defendant does not assert a claim of error with his argument that the objective element of aiding and abetting an implied malice murder should be refined, we do not address the argument. (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)

As to the subjective element, defendant argues the trial court's finding that he " 'aided and abetted and/or conspired with Gregory Mitchell to hunt down Marcus . . . and kill him' " conflicted with the jury's finding that defendant did not commit first degree murder, and thus the trial court's finding was prohibited by principles of collateral estoppel. The trial court, however, did not rely on defendant's specific intent to kill when finding defendant guilty of second degree murder, it relied on his conscious disregard for life. Indeed, the trial court ruled that defendant "either specifically intended to aid Mitchell in killing Marcus *or* knew Mitchell intended to shoot Marcus, an act inherently dangerous to human life where murder is a reasonabl[y] foreseeable consequence. And

15

the act was a *conscious disregard for life* by [defendant] continuing to aid Mr. Mitchell by locating Marcus." (Italics added.)

Still, defendant argues the trial court's finding incorporating the conscious disregard standard was precluded because the arguments made by the prosecution at defendant's trial and the jury's questions and verdicts demonstrate the jury rejected conscious disregard as the basis for murder. Not so. The jury made no explicit finding that it rejected aiding and abetting an implied malice murder, as opposed to failing to consider the theory's applicability entirely. Defendant relies on inferences to conclude the jury must have based its verdict on the felony-murder rule and rejected implied malice murder. This, however, is not sufficient to invoke principles of collateral estoppel. (See *People v. Strong* (2022) 13 Cal.5th 698, 715-716 [among other things, to invoke collateral estoppel, the issue "must have been necessarily decided in the former proceeding"].) There is nothing in the record demonstrating the jury decided defendant did not commit implied malice murder when rendering its second degree murder verdict.

Further, it may be true, as defendant argues, that the jury based its second degree murder verdict on the felony-murder rule. But that was the reason defendant was afforded an evidentiary hearing to relitigate beyond a reasonable doubt whether he is guilty of second degree murder under current law. (§ 1172.6, subds. (a), (d).) After participating in that hearing, the trial court, which acts as the fact finder (*Gentile*, *supra*, 10 Cal.5th at p. 855), concluded defendant was guilty of murder as an accomplice to implied malice murder. Defendant does not argue the trial court utilized the wrong burden of proof when making its findings, and thus we find no basis for reversal.

III

*Sufficient Evidence Supports The Trial Court's Finding*

*That Defendant Was An Accomplice To Implied Malice Murder*

Defendant contends insufficient evidence supports the trial court's finding that he committed implied malice murder. Specifically, defendant contends there is insufficient

16

evidence he was subjectively aware his conduct endangered human life and that he acted with a conscious disregard for life. We disagree.

We review the trial court's factfinding on the question of whether a defendant committed a murder under a valid theory for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We analyze the record in the light most favorable to the trial court's finding and determine if there is sufficient substantial evidence to find the defendant guilty beyond a reasonable doubt. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.)

"Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 298.) We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"To be culpable as a direct aider and abettor of implied malice murder, the accomplice 'must, by words or conduct, aid the commission of the life-endangering act.' [Citation.]" (*Glukhoy*, *supra*, 77 Cal.App.5th at p. 588, rev. granted, italics omitted.) " 'The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the

17

perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' " (*Ibid.*, italics omitted.)

" 'Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility. [Citation.] Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime. [Citation.]' [Citation.] Along with presence at the scene of the crime and failure to prevent it, 'companionship' and 'conduct before and after the offense,' including 'flight,' are relevant to the [trier of fact]'s determination as to whether a defendant aided and abetted in the commission of the crime." (*People v. Lara* (2017) 9 Cal.App.5th 296, 322.)

The life-endangering act committed by the perpetrator was Mitchell's shooting of Marcus. Defendant aided Mitchell in the commission of that life-endangering act by helping Mitchell locate Marcus so that Mitchell could confront Marcus about disrespecting defendant's sister. Defendant knew Mitchell's intent was to shoot Marcus because, as the trial court found, defendant had just seen Mitchell shoot Marquis in an effort to find Marcus. Further, as the trial court noted, defendant subjectively knew locating Marcus for Mitchell to confront him was dangerous to human life because Mitchell's prior conduct of threating to kill Marquis and shooting Marquis demonstrated Mitchell's intentions towards Marcus went beyond a verbal confrontation. Further, defendant's efforts to facilitate a confrontation between Mitchell and Marcus while knowing of Mitchell's intentions showed defendant consciously disregarded the risk to Marcus's life. Through defendant's conduct, he did not merely know of Mitchell's criminal purpose, but assisted Mitchell in carrying out that criminal purpose. Indeed, defendant helped Mitchell locate Marcus so that Mitchell could shoot him as retribution for disrespecting defendant's sister.

18

Defendant disputes this interpretation of the facts, arguing that the trial evidence established he did not see Mitchell shoot Marquis. But the evidence was inconsistent on this point. While defendant testified he did not see Mitchell shoot Marquis, both Romano and Marquis testified defendant was present when Mitchell shot Marquis. We adopt the version of the evidence that supports the verdicts, not that which supports defendant's version of events. (See *People v. Jones*, *supra*, 51 Cal.3d at p. 314.) Also, defendant points us to a series of appellate cases concluding the evidence was either sufficient or insufficient to sustain an implied malice verdict. None of these cases is either controlling or persuasive. "Reviewing the sufficiency of evidence . . . necessarily calls for analysis of the unique facts and inferences present in each case, and therefore comparisons between cases are of little value." (*People v. Rundle* (2008) 43 Cal.4th 76, 137-138, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.App.5th 390, 421.) Here, the evidence that defendant acted with conscious disregard for the lives of others is well supported by the record.

IV

*Alleged Evidentiary Errors*

Defendant contends the trial court erred by admitting into evidence transcripts from his and Mitchell's parole suitability hearings and Mitchell's testimony that he needed defendant for "backup" when locating Marcus and Marquis. We disagree.

We review the trial court's admission of evidence for an abuse of discretion. (*People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 22-23.) We evaluate the harmlessness of any error by asking "whether it is reasonably probable the appellant would have obtained a more favorable result absent the error." (*Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1286.)

A

*Admission Of The Transcripts From Defendant's And Mitchell's*

*Parole Suitability Hearings, If Error, Was Harmless*

Defendant contends the trial court erred by admitting into evidence the transcripts from his two parole suitability hearings and from Mitchell's parole suitability hearing. He argues the error was prejudicial because the prosecution heavily relied on the transcripts when arguing its case of murder. We disagree.

Regardless of whether error occurred, defendant cannot demonstrate prejudice. (See *Conservatorship of K.W.*, *supra*, 13 Cal.App.5th at p. 1286.) As support for its ruling, the trial court pointed to defendant's statements during his parole suitability hearing describing how he and Mitchell confronted Marquis and fired their guns at Marquis before separately looking for Marcus while armed. As the trial court noted, these facts were already established by the evidence admitted at trial. The trial court further noted its ruling would have been the same without considering statements from defendant's and Mitchell's parole suitability hearings. Given the trial court's limited reliance on the hearing transcripts and assertion it would have made the same ruling without considering the transcripts, defendant has failed to demonstrate prejudice necessary for reversal.

B

*The Trial Court Did Not Abuse Its Discretion By Admitting Into*

*Evidence Mitchell's Testimony That He Needed Defendant For Backup*

During Mitchell's testimony, he said he waited for defendant before confronting Marcus because "[he] needed to make sure [he] had backup." Mitchell explained he could rely on defendant because Mitchell's girlfriend was defendant's sister and defendant loved his sister dearly. Further, "back in the day", "that's how we got down. We handled our business . . . we didn't trust the police because they twist the truth." Following objection from defendant, the trial court acknowledged there was no evidence

20

Mitchell communicated to defendant that he was waiting on him for backup to confront Marcus.

Defendant contends the trial court abused its discretion by considering this testimony as evidence of defendant's mental state. Specifically, defendant points to the trial court's statements during its ruling that "[Mitchell] testified that he had to make sure '[he] had backup. And that is how [they] got down.' [Defendant] was aware that Mr. Mitchell was armed, that [he] threatened to kill Marquis unless [Marquis] gave up the location of [Marcus]." Defendant argues the trial court obviously violated its own ruling and impermissibly attributed Mitchell's intent to defendant. We disagree.

During its ruling, the court did not say it believed defendant knew Mitchell was waiting on him as backup in this particular instance and for the purpose of locating Marcus. Instead, the trial court's statements can be fairly read as indicating the established practice between Mitchell and defendant. This was a permissible inference from Mitchell's testimony. Mitchell described his reliance on defendant as something that typically occurred because that was how they handled their business at that time. Mitchell could rely on defendant even more so in this instance because the situation involved defendant's sister, whom defendant loved. The trial court did not consider Mitchell to have communicated his thoughts to defendant before confronting Marcus. Accordingly, there was no evidentiary error.

V

*Defendant Has Not Demonstrated The Trial Court Impermissibly Relied On Our Prior Opinion Or Statements Made By The Court During Defendant's New Trial Motion*

Defendant contends the trial court impermissibly relied on our prior appellate court opinion and statements made by the judge at the hearing on defendant's new trial motion when determining defendant's guilt. We disagree.

As it pertains to our prior opinion, defendant cites to the trial court's statement that it reviewed the opinion before making its ruling. Defendant also compares the version of

21

section 1172.6 in effect at the time of his evidentiary hearing with the version in effect now and notes section 1172.6 was amended to clarify that the trial court may consider our appellate opinion only for the procedural history recited in it. In reply, defendant argues our opinion contained many credibility determinations the trial court was precluded from considering under current section 1172.6, and consideration of those credibility findings was error.

The problem with defendant's argument is that he has pointed us to nothing in the trial court's ruling indicating it adopted any of the credibility determinations or factual conclusions contained in the appellate court opinion. Nor does defendant point to any evidence missing from the trial court's analysis in favor of the evidence discussed in our prior opinion. Accordingly, even if the trial court did rely on the appellate court opinion as an evidentiary source, defendant has failed to demonstrate he was harmed by that error. (Cf. *People v. Langi* (2022) 73 Cal.App.5th 972, 975-977, 980 [error for the trial court to summarily deny a petition for resentencing based on an appellate court opinion's statement that the defendant delivered a fatal punch because the opinion did not identify any express finding that the defendant "threw the fatal punch, any uncontroverted evidence establishing that fact, or any concession by the defendant of its truth"].)

As it pertains to the trial court's statements during defendant's new trial motion, defendant argues the trial court adopted those statements as its own, instead of making its own conclusions based on the evidence. While the trial court recited statements made by the court during defendant's new trial motion, it also engaged in a thorough analysis of evidence admitted at defendant's trial and evidentiary hearing, as well as the law. Read as a whole, the trial court did not replace its reasoning with the reasoning of the court at defendant's new trial motion.

## VI

*Defendant Was Not Harmed By The Trial Court's*

*Failure To Consider His Youthfulness*

Defendant contends the trial court erred by failing to consider his youthfulness when determining whether he acted with conscious disregard for human life. We disagree.

We observe that the California case law upon which defendant relies holds that youth at the time of the offense is a relevant factor in determining whether a defendant is a major participant in a crime and has acted with reckless indifference to human life. It does not hold that courts are required to consider youth as a factor in evaluating whether a direct aider and abettor has acted with a conscious disregard for human life, the relevant question before us. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-992 [addressing whether the 15-year-old defendant acted with reckless indifference to human life]; *In re Moore* (2021) 68 Cal.App.5th 434, 453-454 [finding insufficient evidence that 16-year-old defendant acted with reckless indifference to human life and recognizing children are generally less mature and responsible than adults].)

Even if there were case law supporting defendant's contention that courts should consider a defendant's youthfulness and maturity in evaluating whether a defendant acted with a conscious disregard for the risks attendant to their conduct, defendant does not point us to any evidence in the record that indicates his chronological age reflected immaturity. Our review of the record did not uncover any evidence by experts regarding brain development; nor did we discover evidence in the record regarding defendant's maturity at the time of the crime.

Defendant's attorney argued at the resentencing hearing that defendant was 19 years old and "[t]he idea a[] 19-year-old is going to stop a 33-year-old man from doing something, I think that the trial testimony from [defendant] doesn't suggest that somehow not being able to stop it meant that he had the intent, the specific intent, to kill Marcus."

23

But none of that argument directs us to evidence that defendant's youth impeded his ability to appreciate the risks associated with his conduct. There is simply nothing in the record before us that indicates youth played a factor in Marcus's murder.

## DISPOSITION

The trial court's order denying defendant's petition for resentencing is affirmed.

/s/ _____
ROBIE, Acting P. J.

We concur:

/s/ _____
HULL, J.

/s/ _____
EARL, J.